## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| LARHONDA REID, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CV-916 JAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying LaRhonda Reid's ("Reid") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

### I.    Background

On June 17, 2011 and June 21, 2011 respectively, Reid filed applications for disability insurance under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and for SSI benefits under Title XVI of the Act, 42 U.S.C. §§1381, *et seq.* (Tr. 131-138) In both applications, Reid alleged disability beginning July 8, 2007. The Social Security Administration ("SSA") denied Reid's claims on September 27, 2011. (Tr. 78-82)  She filed a timely request for a hearing before an administrative law judge ("ALJ") on November 22, 2011.  (Tr. 85-86) Following a hearing on March 14, 2013 (Tr. 25-65), the ALJ issued a written decision on April 8, 2013, upholding the denial of benefits. (Tr. 9-24) Reid requested review of the ALJ's decision by the Appeals Council.  (Tr. 5-8)  On March 14, 2014, the Appeals Council denied Reid's request for review.

(Tr. 1-7) Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Reid filed this appeal on May 13, 2014. (Doc. 1) The Commissioner filed an Answer. (Doc. No. 9) Reid filed a Brief in Support of her Complaint. (Doc. No. 11) The Commissioner filed a Brief in Support of the Answer. (Doc. No. 18) Reid filed a Reply Brief. (Doc. 19)

## II. Decision of the ALJ

The ALJ determined that Reid met the insured status requirements of the Social Security Act through March 31, 2008,[1] and had not engaged in substantial gainful activity since July 8, 2007, the alleged onset date of disability. (Tr. 14) The ALJ found Reid had the severe impairments of diabetes mellitus with neuropathy and retinopathy and obesity, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15)

After considering the entire record, the ALJ determined Reid had the residual functional capacity ("RFC") to perform light work, except that she must avoid climbing ropes, ladders, and scaffolds and the hazards of heights. Reid may frequently push and pull with her legs and engage in fingering and fine manipulation. (Tr. 16-19) The ALJ found Reid capable of performing past relevant work that does not require the performance of work-related activities precluded by her RFC, such as cashier, training coordinator, receptionist and collections. (Tr. 20) Thus, the ALJ concluded Reid had not been under a disability from the alleged onset date of July 8, 2007 through the date of her decision, April 8, 2013. (Id.)

## III. Administrative Record

The following is a summary of the relevant evidence before the ALJ.

---

[1] To be entitled to disability benefits under Title II of the Act, Reid must establish the onset of her disability prior to the expiration of her insured status on March 31, 2008. (Tr. 12) See 20 C.F.R. § 404.130.

## A.  Hearing Testimony

The ALJ held a hearing in this matter on March 14, 2013. The ALJ heard testimony from Reid and James Israel, a vocational expert.

### 1.  Reid's testimony

Reid was 39 years old at the time of the hearing and living with her mother and son, age twelve. (Tr. 28) She was married but separated from her husband. (Tr. 29) She completed the twelfth grade in school. (Tr. 29) She took some coursework in medical coding and billing but did not complete the six-month program. (Tr. 32-33) Reid is not currently in school. (Tr. 33) Reid was diagnosed with Type 2 diabetes in 1995. (Tr. 35)

Reid last worked as a cashier for Schnucks in 2007. She stopped working because the neuropathy in her legs and hands made it physically impossible for her to perform her job duties. (Tr. 35) After leaving Schnucks, Reid started babysitting for her sister's children and taking care of her grandmother. (Tr. 35, 52) Reid cared for her grandmother until she passed away in 2011. (Tr. 52) She stopped babysitting for her sister's children in December 2012 because she could no longer lift her niece. Reid has also worked as a training coordinator, cashier, and receptionist (Tr. 30), and volunteered at her son's school and for a faith-based community organization, Ministry Alliance doing paperwork. (Tr. 50-51)

When first diagnosed with diabetes, Reid treated with pills, but has treated with both pills and insulin since early 2010. (Tr. 35) Reid testified she is compliant with her treatment and medication. (Tr. 36) The side effects from her diabetes medication leave her fatigued and dizzy. (Tr. 50) In terms of activities she does to help with her diabetes and obesity, Reid testified she walks as much as she can. (Tr. 36-37, 41) Her doctor wanted her to exercise with weights, but she can hardly lift them, so she doesn't do that. (Tr. 37)

When asked how diabetes has prevented her from keeping a full time job, Reid testified that diabetes has "ruined [her] life." (Tr. 39) She describes her energy level as very low; she has difficulty getting up in the morning. Once she gets her son off to school, she takes care of herself. By noon she needs to nap to be able to deal with him after school. It was Reid's testimony that she naps from 11:30 to 3:00 on most days. (Id.)

Reid has neuropathy in her legs, hands and arms. She experiences neuropathy in her legs four days out of the week. (Tr. 39-40) When the neuropathy is affecting her, she can stand in one place for only 15 minutes. Otherwise she can stand for about a half hour. (Tr. 40-41) Reid also experiences neuropathy in her hands every day. (Tr. 43) She wakes up with numbness in her hands. (Id.) As a result she can't grab or hold on to a lot of things and has difficulty writing and typing. (Tr. 43-44)

It was Reid's testimony she was prescribed a cane in 1998, following a car accident. (Tr. 42) Her treating physician Dr. Baker recommended she use a cane to help with her balance. (Tr. 41, 43) She uses the cane every day if she has to leave the house. Otherwise, she probably doesn't use it 7-8 days out of the month. (Tr. 42) Reid also has retinopathy and sees a specialist for her eyes. She wears glasses daily for distance, but takes them off to read and write. (Tr. 44-45)

Reid testified her health problems have really depressed her. She has not seen a psychiatrist and is not getting any treatment or therapy for depression. (Tr. 45-46) According to Reid, depression is a problem for her every day. (Tr. 46) She was prescribed medication, but doesn't take it daily because it makes her feel "loopy." (Tr. 47)

In 2011, Reid underwent emergency gallbladder surgery. (Tr. 47-48) Since the surgery, her abdominal pain is better and she takes medication three times daily to manage the pain. (Tr.

48) She has also had a lot of neck pain. Her doctor sent her for some X-rays but hasn't called her to discuss the results. (Id.) She has had neck pain for over a year. Activities that aggravate her neck pain include sitting straight and standing too long. (Id.) Given her health issues, it was Reid's testimony that the maximum amount of weight she can lift is about 10 pounds. If she lifts more than that she experiences spasms and numbness. (Tr. 49)

Reid and her mother do the grocery shopping together for the house. Reid rides in a cart instead of walking through the stores. (Tr. 51) She stopped driving in 2007 because her leg gave out and she accelerated. (Tr. 51-52) She does not do any housecleaning; her mother and son generally take care of the house. (Tr. 53) She can do dishes occasionally. (Tr. 53) She smokes about two cigarettes a day. (Tr. 53) She can take care of her personal hygiene. (Tr. 52)

## 2. Testimony of Vocational Expert

Vocational expert James Israel characterized Reid's most significant work experience as a training coordinator, DOT (Dictionary of Occupational Titles) number 166.167-054, with an SVP (Specific Vocational Preparation) of 8, skilled and light. (Tr. 56-57) Her work experience as a cashier in a service station, DOT number 211.462-010, has an SVP of 2, unskilled and light. (Tr. 57) The cashier job at Schnucks is classified as cashier/checker, DOT number 211.462-014, and has a SVP of 3, semi-skilled and light as performed. (Tr. 57-58) The receptionist position at a salon, DOT number 352.667-010, has an SVP of 3, semi-skilled and light. (Tr. 58-59) According to Israel, this position also has some application to the volunteer receptionist/secretary position. (Tr. 58) In terms of Reid's volunteer work, babysitter, DOT number 301.677-010, has an SVP of 3, semi-skilled and medium, and companion to an elderly relative, DOT number 309.677-010, has an SVP of 3, semi-skilled and light. (Tr. 59) Israel noted that the companion position references a home health aide, DOT number 354.377-014, SVP of 3, semi-skilled,

medium, although that usually applies to certified home health aides. (Tr. 59) Lastly, collections is listed as a part-time job by DOT number 203.362-010, with an SVP of 4, semi-skilled, sedentary by position. (Tr. 59)

The ALJ gave Reid no limitations for her mental or visual impairments. (Tr. 61-62) The ALJ asked Israel whether Reid could perform any of her past relevant work if she must avoid ropes, ladders, scaffolding and hazardous heights and only frequently do fine fingering manipulation and pushing and pulling with the lower extremities. (Tr. 62) Israel opined that with the exception of home health aide, all of Reid's past work would conform to the ALJ's hypothetical, including training coordinator, cashier, and various receptionist and clerical jobs. (Tr. 62)

Reid's counsel asked Israel to assume an individual limited to lifting and carrying 10 pounds occasionally and less than 10 pounds frequently; limited in standing and walking to two hours during an eight hour work day; and needing the option to change positions every 15-30 minutes. (Tr. 63) The individual is also limited in terms of visual acuity and depth perception; cannot climb ladders, ropes, and scaffolds; and can only occasionally stoop, kneel, crouch and crawl. Lastly, the individual needs to be able to use an assistive device when standing or walking. (Id.) Israel opined that none of Reid's past work would remain and no other work at any skill level would remain. (Tr. 64)

Next, Reid's counsel asked Israel to assume the same limitations as in the ALJ's hypothetical with the following additional limitations: the individual would need to switch between standing, walking and sitting every 15-30 minutes throughout the day; and need an extra two breaks a day outside of normal breaks that would occur randomly. Israel opined there would be no sustainable work because there was too much interruption in persistence and pace. (Tr. 64)

### B. Medical Records

The ALJ summarized Reid's medical records at Tr. 18-19. Relevant medical records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation

process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the

claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## V.    Discussion

In her appeal of the Commissioner's decision, Reid raises two issues. First, she alleges the ALJ failed to properly consider and evaluate all of her impairments, specifically her neck

impairment and depression, when determining her RFC. (Doc. No. 11 at 7-11) Second, Reid argues the ALJ failed to explain how the evidence of record supported her RFC determination. (Id. at 11-14)

### A. Severity of impairments

An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. See Bowen v. Yuckert, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two of the disability evaluation. Page, 484 F.3d at 1043. It is the claimant's burden to establish that her impairment or combination of impairments is severe. Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir.2000). Severity is not an onerous requirement for the claimant to meet, see Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir.1989), but it is also not a toothless standard. See e.g., Page, 484 F.3d at 1043-44.

### 1. Neck impairment

Reid takes issue with the ALJ's RFC determination because it does not discuss or consider her neck impairment despite the objective medical evidence of record. (Doc. No. 11 at 7-8) Reid relies on a consultative physical examination performed on September 14, 2011 by Austin Montgomery, M.D. (Tr. 424-432) During that examination, Reid reported an injury she sustained to her neck in a car accident in 1997. (Id.) Dr. Montgomery noted decreased range of motion and tenderness of the cervical area. (Tr. 428, 432) A cervical x-ray on February 15, 2013 showed anterior inferior endplate spurring present at C5, and to a greater degree at C6, and loss of lordosis in the lateral view with limited range of motion particularly with flexion. (Tr. 530)

In response, the Commissioner notes Reid did not mention her alleged neck impairment in her disability application and that no doctor has specifically treated this condition. (Doc. No. 18 at 16-17) Treatment notes show Reid mentioned neck pain just once in nearly nine years of treatment, in November 2012, despite claiming she had experienced severe neck issues since 1997. (Tr. 480) Moreover, the objective medical records document at most a slightly decreased range of motion which falls short of satisfying Reid's burden of proving her neck issues caused a significant limitation in her ability to perform basic work activities. (Doc. No. 18 at 16-17) Indeed, on September 14, 2011, Dr. Montgomery measured the lateral flexion of Reid's neck at 40 out of a possible 45 degrees, flexion at 45/50, extension at 55/60, and rotation at 75/80 (Tr. 432) and characterized this decreased range of motion as "slight." (Tr. 428) He did not mention neck issues in his ultimate impression, despite accounting for six other impairments. (Tr. 428-29) X-rays performed on February 15, 2013 appeared consistent with Dr. Montgomery's impression. (Tr. 530) Treatment records consistently find Reid had a full range of motion in her neck and that the neck was supple and non-tender, with no pain or stiffness, at multiple physical examinations spanning from August 2009 through February 2012. (Tr. 238, 296-97, 326, 405, 497, 509)

The Commissioner further responds that Reid fails to explain her ability to work between the time of her alleged neck injury in 1997 and her suggested disability onset date 10 years later. (Doc. No. 18 at 17) The medical evidence shows no deterioration in Reid's condition since the time of her alleged injury. The ability to maintain employment with an impairment, together with the absence of evidence that the condition has significantly deteriorated, tends to prove the impairment were not disabling. See Goff, 421 F.3d at 792 (the fact claimant worked with impairments for over three years after her strokes without significant deterioration demonstrated

her impairments were not disabling in the present.). See also Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

In sum, whatever Reid's actual neck impairment, substantial evidence supported the ALJ's findings that it was a non-severe impairment, and the record did not require further development by the ALJ. See Agan v. Astrue, 922 F.Supp.2d 730, 756 (8th Cir. 2013).

### 2. Depression

Reid further argues that in assessing her depression as non-severe, the ALJ ignored probative evidence of her mental impairment. (Doc. No. 11 at 8-10) On October 15, 2010, Reid sought treatment in part because of a depressed mood, and difficulty with sleep, guilt, energy, and appetite. (Tr. 276) She was diagnosed with depression and prescribed Cymbalta for depression. (Tr. 277) On March 11, 2011, Reid again sought treatment for depressive symptoms, including anhedonia.[2] (Tr. 279) She was diagnosed with depression, and prescribed Cymbalta, but declined a psychiatric referral because she was satisfied with the counseling she was receiving from her church pastor. (Tr. 281) As of July 22, 2011, Reid was still being prescribed Cymbalta. (Tr. 468) On December 16, 2011, Reed reported depressive symptoms and requested psychiatric treatment. (Tr. 465) She was diagnosed with low mood, prescribed Cymbalta, and referred to a psychiatrist. (Tr. 466)

On September 14, 2011, Reid underwent a consultative psychological evaluation, performed by Dianna Moses-Nunley, Ph.D. (Tr. 433-438) Reid reported occasional days of severe depression, becoming less social, and not wanting to be around others. (Tr. 435) She also reported feeling guilty because of her inability to do activities she could previously, and from being sick all the time. (Tr. 436) Reid further reported her medication only worked sometimes.

---

[2] Anhedonia is "the inability to gain pleasure from normally pleasurable experiences" and is a core clinical feature of depression. http://www.medicinenet.com (last visited Sept. 8, 2015).

(Tr. 435) Dr. Moses-Nunley noted Reid's mood to be mildly dysphoric with poor incidental memory, and diagnosed her with major depressive disorder (MDD), single episode, mild. (Tr. 437-438) On September 27, 2011, Kyle DeVore, Ph.D., completed a consultative psychiatric review and, based on Dr. Moses-Nunley's report, found Reid's mental impairment nonsevere. (Tr. 439-449)

As a threshold matter, an ALJ is not necessarily required to find a severe impairment simply because a medical professional diagnoses the claimant with depression, see Buckner v. Astrue, 646 F.3d 549, 557 (8th Cir. 2011), or a medical professional prescribes antidepressant medication. See Matthews v. Bowen, 879 F.2d 422, 424-25 (8th Cir.1989). Thus, the fact that Reid was diagnosed with MDD and other medical professionals prescribed her medication for the disorder does not necessarily mean the impairment was severe. Instead, the ALJ must evaluate the record evidence as a whole to determine whether the depression impacts a claimant's ability to work. Id. This requires the ALJ to evaluate a claimant's functional limitations in four broad areas known as the "paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 CFR § 404.1520a(d)(2). A mental impairment is non-severe if it results in no episodes of decompensation and no more than mild limitations in the areas of maintaining concentration, persistence, and pace; social functioning; and activities of daily living. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Here, the ALJ's application of these factors led her to conclude that Reid did not suffer a significant impairment because of depression (Tr. 15), and substantial evidence supports this decision.

In the first functional area, activities of daily living, the ALJ found Reid had no limitation. At the consultative examination, she denied her depression had any impact on her daily activities and stated her daily life was most affected by her physical health issues and low

energy. (Tr. 437) The Commissioner notes this is consistent with Reid's function report and testimony that she cooks for herself and her son daily, helps her son with homework, manages doctor's appointments and health care for the two of them, and does household chores. (Tr. 178-80) She also prepared her insulin; got herself ready in the morning; shopped; rode in a car and used public transportation; read and watched television; walked and stretched; and on good days played video and board games with her son. (Tr. 51-52, 178, 181-82) It was Reid's testimony that she did not begin reporting her depression to doctors until about 2011 because "with everything else I have going on that was the back of the list." (Tr. 46) Consistent with Reid's statements and testimony, Kyle DeVore, Ph.D., the State agency psychologist, found she had no restrictions in activities of daily living. (Tr. 447) The ALJ properly made the same finding.

In the second functional area, Reid reported a decline in social functioning due to depression. (Tr. 437) The ALJ found no evidence of limitations in this area given that Reid lives with her son and mother, interacts with her son's school, volunteers for a ministry and babysits for her sister. (Tr. 15) In the third functional area, Reid reported moderate difficulty with concentration, persistence or pace, yet stated she is able to concentrate well enough to complete most tasks and demonstrated adequate focus on tasks during the consultative examination. (Tr. 437) Accordingly, the ALJ found Reid has mild limitation in this area. (Id.)

Lastly, Reid experienced no episodes of decompensation. The ALJ noted Reid was not receiving any treatment or therapy, had not seen a psychiatrist or psychologist, and only episodically took her psychiatric medications. (Tr.15, 61-62) "The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [claimant's] mental capabilities disfavors a finding of disability." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). See also Williams v. Sullivan, 960

F.2d 86, 89 (8th Cir. 1992) (absence of treatment indicates that a mental impairment is nonsevere). Further, as discussed above, prescription of antidepressant drugs is not conclusive evidence that the mental impairment is disabling. Matthews, 879 F.2d at 424. The ALJ also gave great weight to the opinion of the State agency psychologist, who assessed Reid a GAF[3] score of 70, indicating that her mental health would not significantly interfere with her ability to work. (Tr. 16)

Reid argues the ALJ ignored other probative statements and facts that followed and contradicted the opinions of Dr. Moses-Nunley and Dr. DeVore. (Doc. No. 11 at 9-10) In particular, while treating her for epigastric pain, gastroenterologist David Costigan, M.D., indicated that Reid's depression was a significant factor regarding her symptomatology. (Tr. 450, 453) On February 2, 2012, Dr. Costigan opined that "[o]ne of the problems here is that she is depressed, chronic pain situation and in addition has poor control of her diabetes. I think if she gets better control of her diabetes and gets some medicine for depression she might be feeling better." (Tr. 459) Reid also points to a hospital visit on December 16, 2011, some three months after Drs. Moses-Nunley and DeVore completed their evaluations, at which time she reported depressive symptoms and requested psychiatric treatment. (Tr. 465) She was diagnosed with low mood, prescribed Cymbalta, and referred to a psychiatrist. (Tr. 466) According to Reid, this evidence is significant because it demonstrates the impact of her depression on her physical

---

[3] A Global Assessment of Functioning (GAF) score is a determination based on a scale of 1 to 100 of a "clinician's judgment of the individual's overall level of functioning." Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir.2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000)). A GAF score of 70 indicates mild symptoms or difficulties but generally doing well. Hamilton v. Barnhart, 355 F.Supp.2d 991, 1006 (E.D.Mo. 2005).

impairments and that her depressive symptoms continued to be present for some 1 ½ years after Dr. Moses-Nunley and Dr. DeVore reached their conclusions. (Doc. No. 11 at 9)

With respect to Dr. Costigan's recommendation to seek mental health treatment, under the regulations, where a medical source provides an opinion outside his or her specialty, it is entitled to less weight. See 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii). Also, as the Commissioner points out, Dr. Moses-Nunley based her diagnosis of depression on Reid's reported history and symptoms over an 11-year period. The fact that Reid continued to complain of depressive symptoms does not undermine that opinion, especially in light of her failure to seek any treatment. (Doc. No. 18 at 16)

Reid argues alternatively that even if her neck impairment and depression were considered non-severe, the ALJ erred by failing to consider their limiting affects in determining his RFC. (Doc. No. 11 at 10) It is unclear, however, what functional limitations Reid believes should be included in the RFC to account for these impairments. As discussed above, there is no medical evidence to suggest any particular limitations as a result of those impairments. Insofar as she suffers from neck pain and depression, the ALJ accounted for this by proscribing an RFC which limits Reid to light work. Bridges v. Astrue, 2012 WL 3637712, at *8 (W.D.Mo. Aug. 22, 2012).

In sum, the ALJ found the objective evidence of record did not establish any severe medically determinable condition or mental impairment, and substantial evidence supports that determination.

**B. RFC finding**

RFC is defined as what the claimant can do, despite her limitations, and includes an assessment of physical abilities and mental impairments. Moore, 572 F.3d at 523 (citing 20

C.F.R. § 404.1545(a)(1)); Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir.2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.2000)). It is a function-by-function assessment of an individual's ability to do work-related activities on a regular and continuing basis. It is the ALJ's responsibility to determine the claimant's RFC based on all relevant credible evidence, including medical records, observations of treating physicians and the plaintiff's own descriptions of his limitations. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001). Agency regulations require that the RFC assessment include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts; for example, laboratory findings and nonmedical evidence; daily activities and observations. See SSR 96–8p. In determining a claimant's RFC, the ALJ must consider the limiting effects of all impairments, even those that are not severe. 20 CFR §§ 404.1545(e), 416.945(e); see also Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir.2000). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.

Reid argues the ALJ failed to explain how the evidence of record supported her RFC determination. Specifically, Reid contends the ALJ's summary of the medical evidence does not fulfill the narrative discussion requirement. Reid also argues the ALJ improperly discounted the opinion of her treating physician Dr. Baker. Lastly, Reid challenges the ALJ's credibility analysis. (Doc. No. 11 at 11-14; Doc. No. 19 at 2)

### 1. Narrative discussion

Social Security Ruling 96–8p requires the ALJ to include in the decision "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR

96-8p. In addition, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id. An ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC, if the Court can otherwise discern the elements of the ALJ's decision-making. Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003). Moreover, the ALJ is not required to make explicit findings for every aspect of the RFC, just for the conclusion reached. Social Security Ruling 96–8p. See also, Tawfall v. Astrue, 2010 WL 3781807, at *10 (E.D.Mo. Sept. 21, 2010).

In her opinion, the ALJ discussed Reid's medical history of diabetes, neuropathy and diabetic retinopathy. (Tr. 18-19) She set out her conclusions regarding Reid's limitations, explained why she found certain items of medical evidence in the record more persuasive than others, and discussed what evidence was lacking. Furthermore, while a claimant's RFC is a medical question, an ALJ is not limited to considering medical evidence exclusively. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir.2000). In this case, the ALJ properly considered Reid's treatment noncompliance, self-reported activities of daily living, and her work history. In addition, the ALJ noted the lack of objective evidence to support the degree of limitation Reid alleged as well as the lack of restrictions imposed on Reid by her treating doctors. (Tr. 19) The ALJ also considered the opinions of the state agency medical consultant and gave them significant weight. (Tr. 439-449) Dr. DeVore opined that Reid has no severe mental impairment. The ALJ found this opinion supported by Reid's medical records and the consultative examiner's report.

In summary, the ALJ discussed the relevant medical and nonmedical evidence, why she believed it contradicted Reid's allegations of disabling impairments, and explained how she determined her RFC assessment. This narrative bridge to the RFC determination is more than

18

adequate. <u>Crabtree v. Colvin</u>, 2014 WL 6977779, at *6-7 (E.D.Mo. Dec. 9, 2014); <u>Jones v. Astrue</u>, 2011 WL 4445825, at *9-10 (E.D.Mo. Sept. 26, 2011).

### 2. Medical opinion evidence

In light of the fact that her treating physician, Carl N. Baker, M.D., is the only physician of record to opine on her physical RFC, Reid argues the ALJ improperly discounted his opinion and failed to provide "good reasons" for doing so. (Doc. No. 11 at 13) She states she has received ongoing care for various conditions from Dr. Baker for several years, from February 6, 2004 through November 9, 2012. (Tr. at 368-370, 372, 378-380, 480, 482) Because diabetes mellitus is her primary disabling impairment, Reid asserts that the ALJ's statement that Dr. Baker didn't treat her disabling impairments is inconsistent with the evidence of record.

On February 20, 2013, Dr. Baker completed a medical source statement opining that Reid was not capable of performing sustained work on a regular and continuing basis. (Tr. 532-33) Dr. Baker stated that Reid must avoid all exposure to extreme cold or heat, weather, wetness or humidity, dust or fumes, vibration, hazards and heights. (Tr. 533) He also opined that Reid needed to lie down or recline 4 times per 8-hour workday, with each break lasting 45 minutes. (Tr. 533) He assessed significant limitations in Reid's ability to lift, carry, stand, walk, sit, push, and pull. (Tr. 532)

The ALJ gave Dr. Baker's assessment of Reid's ability to work little weight, finding it "completely unsupported" by his brief treatment notes. (Tr. 19) In her decision, the ALJ noted Dr. Baker rarely saw Reid and, when he did, treated her for conditions generally unrelated to her disability claim. (<u>Id</u>.) Instead, Reid saw specialists for her allegedly disabling impairments who did not evaluate her ability to work. (<u>Id</u>.)

A treating physician's opinion is generally entitled to substantial weight but does not automatically control. Brown v. Astrue, 611 F.3d 941, 951-52 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 880 (8th Cir.2009) (internal quotations and citation omitted). "An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Id. See also Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir.2015). In addition, treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability). Regardless of the weight the ALJ decides to afford the opinion of a medical source, the ALJ must "always give good reasons" for the weight assigned to the opinion. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.2000); Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000)).

Upon review of the record, the Court concludes the ALJ properly evaluated Dr. Baker's opinions, listing "good reasons" for giving them little weight. Prosch, 201 F.3d at 1013. Although Dr. Baker treated Reid from 2004 to 2012, the record shows that, with the exception of four visits for a number of issues in late 2007 (Tr. 372-377), Reid generally saw Dr. Baker once or twice per year for conditions unrelated to her disability claim, such as symptoms related to acid reflux and gastrointestinal issues (Tr. 368-70, 374), as well as for routine checkups. (Tr. 376, 378, 480-82) The ALJ noted Dr. Baker's early treatment notes included more notations regarding diabetes, but that he subsequently referred Reid to a diabetes specialist for treatment in 2008. (Tr. 19, 371, 377, 379-80) More weight is generally given to the opinion of a specialist

about medical issues related to his or her area of specialty than to the opinion of a treating source who is not a specialist. See 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5); Brown, 611 F.3d at 953. Further, no diabetes specialist evaluated Reid's ability to work, as the ALJ observed. (Tr. 19, 462-63, 466, 474-75, 477-78)

The ALJ also found Dr. Baker's opinion, submitted in a check-box format, unsupported by his treatment notes. (Tr. 19, 368-80, 480-82, 532-33) See e.g., Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir.2012) (holding that a checkbox form has little evidentiary value when it " 'cites no medical evidence, and provides little to no elaboration' ") (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir.2010)); Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir.1997) (holding that "[RFC] checklists, though admissible, are entitled to little weight in the evaluation of disability"). For example, Dr. Baker states that Reid requires a cane and experiences dizziness; however, these statements are not corroborated in his treatment notes, or elsewhere in the medical record (Tr. 533).

Moreover, the fact that Dr. Baker was the only treating source to provide an opinion regarding Reid's physical limitations does not mean the ALJ was required to accept it. An ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). The ALJ may reject the conclusions of any medical expert if they are unsupported and inconsistent with the record as a whole. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).

Upon review of the record, the Court concludes the ALJ properly evaluated Dr. Baker's medical opinion, listing "good reasons" for giving it no weight. (Tr. 25, 447-48) More importantly, as discussed above, the ALJ provided a detailed narrative discussion of how the

medical facts and non-medical evidence supported her finding. The Court finds, therefore, that the ALJ's decision to discount the opinion of Dr. Baker is supported by substantial evidence on the record as a whole.

**Credibility determination**

Lastly, in evaluating a claimant's credibility, the ALJ should consider the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). The claimant's relevant work history and the absence of objective medical evidence to support the complaints may also be considered, and the ALJ may discount subjective complaints if there are inconsistencies in the record as a whole. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (citing Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Id. (citing Hall v. Chater, 62 F.3d 220, 223 (8th Cir.1995)). The Court will uphold an ALJ's credibility findings, so long as they are adequately explained and supported. Ellis, 392 F.3d at 996.

In her decision, the ALJ considered Reid's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility. Her medical records show a history of noncompliance with diabetic medication and insulin. (Tr. 19) She has not visited her specialists for almost a year. She has generally been noncompliant with her doctors' advice to exercise and lose weight and stop smoking. (Tr. 19)

In addition to noncompliance, the ALJ found evidence of exaggeration of symptoms. Reid testified that she needs to use a cane, but this is not supported by her medical records. She claims she cannot drive because of her poor vision, but her visual acuity tests do not confirm

this. She claims disabling neuropathy, but her complaints have not been confirmed by testing and are not being specifically treated. (Tr. 19)

The ALJ also found Reid's activities of daily living were "fairly normal" for an individual who claims to have disabling impairments. (Tr. 19) To be sure, there are cases in which a claimant's ability to engage in certain personal activities "does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Ponder v. Colvin, 770 F.3d 1190, 1196-96 (8th Cir. 2014) (citing Singh, 222 F.3d at 452; Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)). But that is not the case where, as here, Reid was actually advised to increase her activity and exercise to help her condition.

Because the ALJ's determination not to credit Reid's subjective complaints is supported by good reasons and substantial evidence, the Court defers to her determination. Cobb v. Colvin, 2014 WL 6845850, at *14 (E.D.Mo. Dec. 3, 2014) (internal citations omitted). See also Polaski, 739 F.2d at 1322.

## VI. Conclusion

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

Dated this 16th day of September, 2015.

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**